UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
SUNITA ESWARAPPA,                                   )
                                                    )
            Plaintiff,                              )
                                                    )          Civil No.
            v.                                      )          14-14255-FDS
                                                    )
COMMUNITY ACTION INC./HEAD START,                   )
                                                    )
            Defendant.                              )
_____)


MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION TO STRIKE AND MOTION FOR SUMMARY JUDGMENT

SAYLOR, J.

        This is an action alleging unlawful employment discrimination on the basis of age and

national origin.  Plaintiff Sunita Eswarappa, who is proceeding *pro se*, was employed as a

teacher at Community Action Inc./Head Start ("CAI") for approximately seven weeks.  She

alleges that she was unlawfully terminated from her position because of her age and national

origin in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1)

("ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and Mass. Gen.

Laws ch. 151B § 4.  She has also alleged claims for discrimination based on a hostile work

environment and retaliation.[1]

        CAI has moved for summary judgment on all claims.  For the reasons stated below, that

motion will be granted.

_____

        [1] Eswarappa has filed at least two other actions against employers claiming employment discrimination on
similar grounds.  *See Eswarappa v. Andover Children's Academy*, Civil Action No. 14-10214-ADB (D. Mass.);
*Eswarappa v. Shed INC./Kid's Club*, Civil Action No. 06-11169-RBC (D. Mass.).

I.      **Background**

      A.      **Factual Background**

Unless otherwise noted, the following facts are undisputed.

CAI is a private non-profit organization that provides resources and opportunities for children living in poverty in the Haverhill, Amesbury, and Newburyport areas.  (Espinola Aff. ¶ 2).  It offers a Head Start program that provides services for infants, toddlers, and children through age five.  (*Id.*).

Sunita Eswarappa is a resident of Andover, Massachusetts.  (Compl. ¶ 1).  She is a 59-year-old woman who is originally from India.  She graduated from the University of Mysore in India in 1982 with baccalaureate degrees in economics, political science, and sociology.  (*Id.* at 2).  She also has associate degrees in early childhood education and general studies.  (*Id.*).

      1.      **The Application and Hiring Process**

Sometime between June and August 2011, Eswarappa applied for a position as a teacher at CAI.  (Paterniti Aff. Ex. B; Pl. Ex. 2).[2]  The Director of Children Services for the Head Start Program, Christina Espinola, coordinated her interviews for the position of preschool teacher.  (Espinola Aff. ¶ 3).  Following the interviews, Espinola made a recommendation to CAI's Policy Council that they hire Eswarappa, and the Council approved her recommendation.  (*Id.*).[3]  Eswarappa contends that she was hired in a full-time position, while CAI contends that she hired in a seasonal position.  (Pl. Ex. C; Espinola Aff. ¶ 4).  It is undisputed that she was hired in August 2011 and began work in early September.  (Compl. ¶¶ 4-5; Def. SMF ¶ 3).

---

[2] The date on which Eswarappa applied and the position to which she applied are unclear from the record. CAI has produced a copy of her application dated August 18, 2011, and indicating that she was applying for the position of "teacher."  (Paterniti Aff. Ex. B).  Eswarappa has produced an e-mail that she sent to someone at CAI on June 27, 2011, applying for the position of "lead teacher."  (Pl. Ex. 2).  However, at her deposition, she identified the August 18 application as her application for employment with CAI.  (Pl. Dep. at 18).

[3] The final step of CAI's hiring process requires approval from its Policy Council.  (Espinola Aff. ¶ 3).

### 2.    Orientation and Training

CAI has a 90-day orientation period that is "intended to give new employees the opportunity to demonstrate their ability to achieve a satisfactory level of performance and to determine whether the new position meets their expectations." (Paterniti Aff. Ex. O). CAI uses that orientation period to "evaluate employee capabilities, work habits, and overall performance." (*Id.*). Either the employee or CAI may terminate the employment relationship at any time during or at the end of the orientation period, with or without cause or advance notice. (*Id.*). All new employees "work on an orientation basis for the first 90 calendar days after their date of hire." (*Id.*).

All first-year teachers at CAI generally receive the same training. (Espinola Aff. ¶ 7). Eswarappa received training from September 6 through September 9, 2011. (Pl. Dep. at 21-22, 42). She contends, without any detail, that she did not receive the same training as other new teachers. (Pl. SMF ¶ 7). On September 7, 2011, she signed a copy of her job description, which indicated that her position was "teacher." (Paterniti Aff. Ex. C). On the same day, she signed CAI's code of conduct. (Pl. Dep. at 36-37). Around the same time, she also received a copy of CAI's employee handbook. (*Id.* at 35-37).

Eswarappa also contends that she did not receive a teaching manual that CAI provided to other teachers. (Pl. SMF ¶ 4). CAI contends that it does not have a teaching manual and did not provide one to any new teacher. (Espinola Aff. ¶ 12).

### 3.    Eswarappa's Employment and Performance

#### a.    Work Schedule

The parties dispute the number of hours Eswarappa was hired to work. Eswarappa

contends that she was hired to work 40 hours per week.  (Pl. Ex. 2).[4]  CAI contends that she was hired to work 30 hours per week.  (Espinola Aff. ¶¶ 4, 9).  It is undisputed, however, that she received two e-mails from Espinola informing her that she was only supposed to work 30 hours per week and that if she continued to work more than 30 hours per week without prior approval, there might be "serious discussion and possible disciplinary measures."  (Paterniti Aff. Ex. G).

Eswarappa worked more than 30 hours every week she was employed at CAI.  (Paterniti Aff. Ex. F).  She contends that she was not able to complete all of her work in 30 hours.  (*Id.*; Pl. Dep. at 131).  She never, however, sought prior authorization to work such a schedule.  (Espinola Aff. ¶ 10).  CAI paid Eswarappa for all hours submitted on her time sheets.  (*Id.*).

### b.      Classroom Observations

CAI regularly assigns supervisors or administrators to observe teachers in the classroom.[5] (*Id.* at 18).  Tiffany Ghrist, an Education Specialist, was assigned to observe Eswarappa's classroom on October 25 and 26, 2011.  (*Id.* at 18-19).  Ghrist shared her observation notes with Espinola, and informed her that she was concerned about Eswarappa's job performance.  (*Id.* at 19).

On October 25, 2011, Ghrist observed a child eat a carrot off of the floor in front of Eswarappa with no intervention.  (Paterniti Aff. Ex. H).  She also observed Eswarappa ask several children to stack chairs without giving them any instruction or direction.  (*Id.*).  While

---

[4] Eswarappa has produced an e-mail from CAI stating that the Policy Council approved the recommendation to hire her as a teacher for 40 hours per week.  (Pl. Ex. 2).  However, the e-mail is dated May 25, 2010, more than one year before she had even applied for the position that gave rise to this litigation.

[5] CAI conducts two different kinds of classroom observations.  It conducts CLASS assessments, which are federally mandated, once per year in either January or February.  Those assessments are used only for professional development purposes and not disciplinary purposes.  (Smith Decl. ¶¶ 2-4).  It also conducts its own routine observations, which may be used for disciplinary purposes.  (Smith Decl. ¶ 5; Espinola Aff. ¶ 18).  It appears that Eswarappa was observed in October 2011 as part of a routine, monthly observation.  (Smith Decl. ¶ 6; Paterniti Aff. Ex. H).

some children were stacking chairs, the others sat and waited without any activity to do.  (*Id.*).
Ghrist also observed Eswarappa speak to her assistant teacher, Keyla Gandulla, in a harsh tone in
front of the children and a parent.  (*Id.*).

On October 26, 2011, Ghrist observed Eswarappa lead her class in an activity called track
painting.  (*Id.*).  No direction was given on what to do or how to use the materials.  (*Id.*).  Ghrist
observed that there was "[n]o conversation or discussion on learning or what was happening
other than if the child wrote their names or not and to correct what was happening."  (*Id.*).  One
child appeared unsure what to do after leaving the teacher-led activity, and Eswarappa did not
provide any assistance or help find another activity for that child.  (*Id.*).  Two children who were
playing at a water table were told to leave because they had "been there awhile," and Eswarappa
did not provide any warning or help finding another activity.  (*Id.*).

In addition to a report of Ghrist's observations, Espinola also received input about
Eswarappa's performance from other teachers.  (Espinola Aff. ¶ 20).  Keyla Gandulla,
Eswarappa's assistant teacher, reported that Eswarappa had told her "I'm in charge, I don't want
to hear from you," or words to that effect.  (*Id.*).  Another teacher reported that she appeared to
not be a good fit for the job.  (*Id.*).

Espinola also personally observed Eswarappa in the classroom.  (*Id.* at 21).  According to
Espinola, she was concerned that Eswarappa was "not providing developmentally appropriate
instruction."  (*Id.*).  She observed an activity in which Eswarappa would tap each child on the
head, and, when tapped, they were supposed to say and spell their names.  (*Id.*).  The children
were not able to follow the directions and do the activity, but she persisted for more than ten
minutes.  (*Id.*).  Espinola ultimately stepped in to redirect the children, and later explained that
she intervened because it became clear that the exercise was not developmentally appropriate for

the children.  (*Id.*).

### 4.    Eswarappa's Complaints

On October 17, 2011, Eswarappa complained to Espinola about three co-workers, Jennifer DeLaCruz, Keyla Gandulla, and Samir Gandulla.  (Pl. Dep. at 86; Paterniti Aff. Ex. K). She complained that her co-workers "spoke Spanish, which I did not understand, to one another," and that "they often did not communicate with me.  I expressed that I felt excluded and that it made it very difficult for me to do my job."  (Pl. Dep. at 86-87; Espinola Aff. ¶ 13).  She also complained about the fact that she had been assigned as the primary teacher for all English-speaking children in her classroom while Gandulla, who speaks Spanish, was assigned as the primary teacher for all Spanish-speaking students.  (Pl. Dep. 93, 119-120).[6]

Espinola then discussed Eswarappa's complaint about co-workers speaking Spanish with DeLaCruz.  (*Id.* at 14).  She concluded that the co-workers had no discriminatory animus towards Eswarappa when they communicated with one another in Spanish.  (*Id.*).  During the incident that gave rise to Eswarappa's complaint, DeLaCruz had received a telephone call from a Spanish-speaking parent and was relaying the information from that call to Gandulla.  (*Id.*).

On October 27, 2011, Eswarappa sent Associate Director Deborah Linett an e-mail indicating that she needed to speak with her.  (Paterniti Aff. Ex. L).  The e-mail did not indicate why she needed to speak with Linett or what the conversation would be about.  (*Id.*).

### 5.    Eswarappa's Termination

On October 28, 2011, within the 90-day orientation period, Eswarappa was terminated. (Espinola Aff. ¶¶ 22-23).  Espinola, Linett, and Deputy Director Marge Hooper made the

---

[6] It is unclear from her deposition testimony whether Eswarappa actually complained to Espinola about having been assigned as the primary teacher for the English-speaking children and, if she did, what the exact nature of the complaint was.  However, for present purposes, the Court will assume that she did complain and that the complaint indicated that she perceived that as a form of discrimination.

decision to terminate her, concluding that she was "not the right fit for the job." (*Id.* at 23). According to CAI, the decision was made prior to Linett's receipt of Eswarappa's October 27 e-mail. (*Id.* at 22).

As of September 2011, approximately 70 percent of CAI's workforce was over the age of 40. (Paterniti Aff. Ex. T). Between 2007 and 2012, eight employees (including Eswarappa) were terminated during their 90-day orientation periods. Of those eight, seven were white and four were under age 40. (Paterniti Aff. Ex. S).

### B.    Procedural Background

Eswarappa filed the complaint in this action on October 27, 2014, in Massachusetts state court. The complaint alleges two counts: (1) retaliation in violation of Mass. Gen. Laws ch. 151B, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the ADEA, 29 U.S.C. § 623(a)(1) (Count One), and (2) disparate treatment and hostile work environment based on age and national origin in violation of Mass. Gen. Laws ch. 151B, Title VII, and the ADEA (Count Two). CAI removed the action to this Court on November 26, 2014.

Eswarappa did not file either a written opposition to the motion for summary judgment or a counter statement of material facts. However, at oral argument on the motion, she submitted a statement of facts and a number of exhibits in support of her opposition. CAI has moved to strike many of the exhibits she submitted.

## II.    Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256–57.

## III.   <u>Analysis</u>

### A.   <u>The Motion to Strike</u>

CAI has moved to strike many of the documents submitted by plaintiff in support of her opposition to its motion for summary judgment.  A motion to strike "may be employed by a defendant only to obtain relief from 'redundant, immaterial, impertinent, or scandalous matter.'" *Boreri v. Fiat S.p.A.*, 763 F.2d 17, 23 (1st Cir. 1985) (quoting Fed. R. Civ. P. 12(f)).  "[S]uch motions are narrow in scope, disfavored in practice, and not calculated readily to invoke the court's discretion." *Id.*

CAI first contends that plaintiff's errata sheet should be struck.  Pursuant to Fed. R. Civ. P. 30(e), a deponent must be given "30 days after being notified . . . that the [deposition] transcript or recording is available in which:  (A) to review the transcript or recording; and (B) if there are change in form or substance, to sign a statement [often called an errata sheet] listing the

changes and the reasons for making them."  Fed. R. Civ. P. 30(e).  CAI contends that plaintiff's errata sheet should be struck for two reasons:  (1) it was untimely and (2) it includes statements that contradict her deposition testimony.

As to the timeliness of plaintiff's errata sheet, it appears that she sent it to counsel for CAI on January 20, 2017, which was 36 days after she received notice (on December 15, 2016) that the transcript was available.  However, it appears that she relied on a misstatement from the court reporter, who stated that she had "30 days from the time of *receipt* of the transcript to read and sign it."  (Pl. Opp. at 6 (emphasis added)).  She received the transcript itself on December 21, 2016.  Because she sent the errata sheet to counsel for CAI within 30 days receiving the transcript, apparently in reliance on a representation made by the court reporter, and because of her *pro se* status, the Court will treat the errata sheet as timely.

As to the contradictory statements contained in the errata sheet, Rule 30(e) explicitly states that changes may be "in form or substance."  Fed. R. Civ. P. 30(e).  The rule does not appear to preclude changes that contradict the actual testimony.  *See Elwell v. Conair, Inc.*, 145 F. Supp. 2d 79, 86 (D. Me. 2001) ("Rule 30(e) allows deponents to provide revised answers to deposition questions, including answers contradictory to those provided at the deposition.") (internal quotation marks omitted).  Furthermore, plaintiff adequately explained the reasons for the changes made, indicating, for example, where words had been misinterpreted or left out.  Accordingly, the motion to strike will be denied as to the errata sheet.

CAI also contends that various other documents included in support of plaintiff's opposition should be struck, including documents not produced during discovery and documents altered with handwritten notes.  CAI has failed, however, to show how the inclusion of those documents would cause it any prejudice.  *See Sheffield v. City of Boston*, 319 F. R. D. 52, 54 (D.

Mass. 2016) (noting that "Rule 12(f) motions are not typically granted without a showing or prejudice to the moving party."). The motion will therefore be denied, except as to the handwritten notes, which will be struck.

### B. **Discrimination Claims**

#### 1. **Disparate Treatment**

Count Two of the complaint alleges discrimination on the basis of age and national origin in violation of the ADEA, Title VII, and Mass. Gen. Laws ch. 151B. Federal and Massachusetts discrimination law follows the familiar burden-shifting framework established under Title VII in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 446-47 (1st Cir. 2009) (ADEA); *Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 127-28 (1997) (Mass. Gen. Laws ch. 151B). Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Matthews*, 426 Mass. at 128 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). If that burden is met, the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for its [employment] decision and to 'produce credible evidence to show that the reason or reasons advanced were the real reasons.'" *Id.* (quoting *Blare v. Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 442 (1995)) (internal citations omitted). If the defendant meets that burden, then "the presumption of discrimination vanishes, and the burden returns to the plaintiff to persuade the court, by a fair preponderance of the evidence, that the defendant's proffered reason for its employment decision was not the real reason" and that "it was more likely than not that the articulated reason was pretext for actual discrimination." *Id.* (internal quotation marks omitted).[7]

---

[7] The standard for establishing pretext is different under Massachusetts law and federal law. Massachusetts is a "pretext-only" jurisdiction, meaning that a "plaintiff need only present evidence from which a reasonable jury

a.    ***Prima Facie* Case**

To satisfy her initial burden, plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse job action by her employer; and (4) defendant subsequently filled the position. *Velez*, 585 F.3d at 447; *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003).[8]  Here, it is undisputed that plaintiff is of Indian descent, that she is over age 40, and that she was terminated.  Accordingly, she has satisfied prongs one and three.  Furthermore, it appears that she was replaced by a 35-year-old white woman.  (Def. Resp. to Interrog. at No. 6).  While the relative qualifications of the woman hired to replace plaintiff are not in evidence, defendant does not contend that she has failed to satisfy her *prima facie* burden on that basis, and the Court will therefore assume that she has satisfied the fourth prong.  Finally, the parties dispute whether plaintiff was qualified for the

---

could infer that 'the respondent's facially proper reasons given for its action against him were not the real reasons for that action.'"  *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 681-82 (2016) (quoting *Wheelock Coll. v. Massachusetts Comm'n Against Discrimination*, 371 Mass. 130, 139 (1976)).  Under federal law, a plaintiff must also establish that the true reason for the action was discriminatory.  *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 56 (1st Cir. 1999).  However, in practice, the difference is often insignificant.  *See id.* (stating that the same evidence used to establish that the employer's articulated reason is false can be used to show that the real reason was discriminatory "provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." (internal quotation marks omitted)).

[8] There are slight variations in the formulation of the fourth element under the different statutes.  Under the ADEA, the fourth element requires only that a plaintiff show that her position was filled.  *Velez*, 585 F.3d at 447.  Under Title VII, she must show that defendant sought to replace her with someone with "roughly equivalent qualifications."  *Benoit*, 331 F.3d at 173.  Under Mass Gen. Laws ch. 151B, there is some inconsistency in the case law concerning whether the fourth element even applies at all.  *Compare Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 41 (2005) (stating that plaintiff's *prima facie* burden under Mass. Gen. Laws ch. 151B generally consists of four elements, including that plaintiff was replaced by another individual with similar qualifications) *with Bulwer*, 473 Mass. at 681 (stating, without explanation, that plaintiff's *prima facie* burden under Mass. Gen. Laws ch. 151B consists of only the first three elements).

To the extent the fourth element does apply, the standard varies depending on the kind of discrimination alleged.  For claims of discrimination on the basis of national origin, the standard (if it applies at all) appears to be the same as under Title VII.  *See Abramian v. President & Fellows of Harvard Coll.*, 432 Mass. 107, 116 (2000).  In cases alleging age discrimination, the fourth element (if it applies) requires a plaintiff to allege that she was replaced with someone younger.  *See Knight v. Avon Prods., Inc.*, 438 Mass. 413, 423-25 (2003).  However, whether the fourth element applies and what is requires is immaterial here, as the Court will assume for purposes of summary judgment that the plaintiff has satisfied her *prima facie* burden.

position she held.  However, because defendant's contention that she was not qualified relies upon its proffered legitimate reason for her termination, the Court will assume for present purposes that plaintiff has satisfied her *prima facie* burden and proceed to the second step of the burden-shifting framework.  *See Velez*, 585 F.3d at 448 (stating that "the district court erroneously accepted for the purpose of the *prima facie* analysis [defendant's] stated reason for firing [plaintiff] as proof that he was not qualified for [his] job").

### b.   Legitimate, Nondiscriminatory Reason

At step two, the burden shifts to CAI to articulate a legitimate, nondiscriminatory reason for its decision.  It contends that it terminated plaintiff due to numerous problems with her performance.  In particular, it contends that she was observed engaging in inappropriate behavior, such as asking preschool-aged children to stack chairs without giving them adequate instructions; failing to intervene when a child ate a carrot off of the floor; speaking harshly to an assistant teacher in front of the children; and engaging children in activities that were not developmentally appropriate.  CAI also contends that plaintiff worked for more than 30 hours per week for all eight weeks of her employment, despite being told repeatedly that she was not to do so without prior approval.

Plaintiff disputes that she was not supposed to work more than 30 hours per week.  The Court will treat the issue as a disputed question of material fact and will not consider it for purposes of summary judgment.  Nonetheless, CAI has satisfied its burden at step two based upon its contention that it terminated plaintiff due to concerns with her performance.  There is ample evidence in the record to support that contention.  (*See* Paterniti Aff. Ex. H; Espinola Aff. ¶ 20).

c.   **Pretext**

At the third step, the burden shifts back to plaintiff to produce evidence that defendant's stated reason for her termination was not the real reason but was a pretext for discrimination.

As a preliminary matter, "in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."  *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991), *quoted in LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 847 (1st Cir. 1993); *accord Dziamba v. Warner & Stackpole LLP*, 56 Mass. App. Ct. 397, 406 (2002).  Here, Espinola both recommended that CAI hire plaintiff and participated in the decision to terminate her employment, all within a two-month period.  Plaintiff must therefore overcome the "strong inference" that CAI's stated reason for her termination was the real reason and was not a pretext for discrimination.

Plaintiff has failed to produce sufficient evidence to overcome that inference.  She has failed to offer any evidence suggesting that CAI did not believe its stated reason for terminating her, that it provided inconsistent reasons for her termination, or that its proffered reason is implausible.  *See Abramian v. President & Fellows of Harvard College*, 432 Mass. 107, 117 (2000) (stating that plaintiff can establish pretext by "showing that the reasons advanced by the employer for making the adverse decision are not true."); *Rhodes v. JPMorgan Chase & Co.*, 562 F. Supp. 2d 186, 193 (D. Mass. 2008) (noting that pretext can be established by showing implausibilities or inconsistencies in employer's stated legitimate reasons for termination).  In fact, in her own deposition she agreed that it would be inappropriate conduct for a teacher to fail to intervene when a student ate something off of the floor, speak harshly to a colleague in front of students, or fail to provide directions to children engaging in a potentially dangerous activity.

(Pl. Dep. at 63-71).

Plaintiff appears to contend that those classroom observations could not have formed the basis of CAI's decision to terminate her because it was contrary to CAI's policies to use notes from classroom observations as a basis for disciplinary action.  That contention is not supported by the record.  The record shows that CAI conducts two different kinds of classroom observations:  (1) CLASS assessments, which are used only for professional development purposes and not disciplinary purposes, and (2) CAI's own routine observations, which may be used for disciplinary purposes.  (Smith Decl. at ¶¶ 2-3, 5; Espinola Aff. ¶ 18).  Plaintiff was observed in October as part of a routine, monthly observation.  (Def. Ex. H).  Because the use of information derived from routine observation for disciplinary purposes was not contrary to CAI's policies, it does not raise an inference that its proffered reason for the termination was not the real reason.

Plaintiff also attempts to show pretext by alleging that she was treated less favorably than Allison Lee, a younger, white employee.  However, there is no evidence in the record to support her allegations of less-favorable treatment.[9]

Plaintiff also appears to contend that discriminatory animus is shown by the fact that CAI assigned her assistant teacher, who spoke Spanish, to be the primary teacher for all Spanish-speaking children in the classroom while plaintiff, who does not speak Spanish, was assigned to be the primary teacher for all English-speaking students.  But requiring that an employee be able to speak a particular language where the circumstances of the job require conversations in that language—and making staffing decisions based on language abilities where those abilities are *bona fide* job requirements—do not constitute national-origin animus.  *See Cosme v. Salvation*

---

[9] Furthermore, any potential inference of animus or pretext is weakened by that fact that Lee was terminated approximately seven months after plaintiff due to concerns about her performance.  (Espinola Aff. ¶ 12).

*Army*, 284 F. Supp. 2d 229, 235, 236 n.5 (D. Mass. 2003); *Garcia v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 660 F.2d 1217, 1222 (7th Cir. 1981).

Finally, while statistical evidence can be relevant to establishing an environment of discrimination, the statistical evidence in this case strongly negates any inference of pretext. For example, seven of the eight employees who were terminated during their 90-day orientation period between 2007 and 2012 were white, and four of the eight were under age 40. (Paterniti Aff. Ex. S). Furthermore, as of September 2011, 70% of CAI's employees were over the age of 40. (Paterniti Aff. Ex. T).

In sum, CAI has provided a legitimate, nondiscriminatory reason for plaintiff's termination, and she has failed to establish that that reason was a pretext. Accordingly, summary judgment will be granted as to plaintiff's disparate-treatment claim.

## 2. **Hostile Work Environment**

Although the claims are not clearly delineated in plaintiff's pleadings, it appears that she also alleges a separate claim for discrimination based on hostile work environment. To succeed on a claim of hostile work environment, a plaintiff must prove that (1) she is a member of a protected class; (2) she was subjected to harassment based on her membership in that class; (3) "there is a basis for employer liability"; (4) "the complained-of conduct was 'sufficiently severe or pervasive so as to later the conditions of the plaintiff's employment and create an abusive work environment;'" and (5) the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fat did perceive to be so." *Rosario v. Dept. of Army*, 607 F.3d 241, 246 & n.12 (1st Cir. 2010) (quoting *Lockridge v. The University of Maine System*, 597 F.3d 464, 473 (1st Cir. 2010) (discussing standard for hostile work environment based on sexual harassment). *See also National R.R.*

15

*Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002) ("Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment."); *Rivera-Rodriguez v. Frito Lay Snacks Caribbean*, 265 F.3d 15, 24 (1st Cir. 2001) (applying same test under ADEA), *abrogation on other grounds recognized by Crowley v. L.L. Bean, Inc.*, 303 F.3d 387 (1st Cir. 2002); *Navarro v. United States Tsubaki, Inc.*, 577 F. Supp. 2d. 487, 509 (D. Mass. 2008) (applying same test under Chapter 151B).

While it is undisputed that plaintiff is a member of a protected class, she has failed to establish that she was subjected to harassment on that basis. Although it is difficult to discern from the pleadings, it appears that plaintiff attempts to base her hostile-work-environment claim on the following alleged conduct: (1) CAI did not give her the same opportunity that it gave other teachers to select a classroom; (2) it did not give her the same opportunity to go on home visits; (3) it did not perform a probationary-period evaluation, as it did for other teachers; (4) it expected her to perform as a lead teacher even though she was not hired as a lead teacher; (5) it did not provide her with the same training that it provided other teachers; (6) it did not provide her with the teaching manual that it provided to other teachers; and (7) she was unable to receive e-mails for the first few weeks of her employment.

Plaintiff has failed to present sufficient evidence to support her allegations of harassing conduct. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 517 (6th Cir. 2009) (disregarding allegation of harassment unsupported by evidence).[10] Even assuming that the alleged conduct did occur, plaintiff has failed to show that any negative treatment was on the basis of her age or

_____

[10] For example, in support of her claim that she did not receive the same training as other new teachers, plaintiff cites to e-mails sent from CAI to staff concerning various training sessions. However, those e-mails fail to establish either that she did not receive adequate training or that she did not receive the same training opportunities as other employees. (*See* Pl. Ex. 7). In addition, in support of her claim that she did not receive CAI's training manual, she has produced a copy of the cover of the manual that she alleges CAI provides to its teachers, but there is no evidence that CAI does in fact use that manual. (Pl. Ex. 6). It appears that she borrowed the manual from a public library.

national origin.  There is not, for example, any evidence of insensitive or derogatory comments made about her age or national origin.  *Compare Navarro*, 577 F. Supp. 2d at 510.

Furthermore, and in any event, plaintiff has failed to establish that the complained-of conduct was sufficiently severe or pervasive or that it was objectively offensive.  The "objective test requires examination of the totality of the circumstances, including 'the frequency of the discriminatory . . . conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Whorton v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 334, 353 (D. D.C. 2013) (quoting *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 23 (1993)).  The conduct alleged is simply not the kind of "intimidat[ing], humiliat[ing], and stigmatiz[ing]" conduct that poses "a formidable barrier" to an individual's ability to participate in the workplace.  *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 532 (2001) (internal quotation marks omitted).[11] Accordingly, summary judgment will be granted as to plaintiff's claim of discrimination based on a hostile work environment.

### C.     Retaliation Claim

Plaintiff further alleges that she was terminated in retaliation for reporting instances of discrimination.  To survive summary judgment on a retaliation claim, a plaintiff must produce sufficient evidence to show that (1) she "reasonably and in good faith believed that the employer was engaged in wrongful discrimination;" (2) she "acted reasonably in response to that belief" by protesting or opposing the discrimination; (3) "the employer took adverse action against [her];

---

[11] Compare, for example, the facts of *Clifton v. Massachusetts Bay Transp. Auth.*, 445 Mass. 611 (2005), where the record established that, among other things, plaintiff's coworkers and supervisors "shot bottle rockets at him, turned the lights off when he used the bathroom, sprayed water at him through fire hoses, dropped firecrackers near him, set water booby-traps that would fall on him when he opened his office door," and painted offensive language on his locker.  *Id.* at 613.

and (4) "the adverse action was a response to the employee's protected activity." *Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 474 Mass. 382, 405-06 (2016) (internal quotation marks omitted).

Even assuming that plaintiff has established the first three elements, she cannot establish that her termination was a response to any protected activity in which she may have engaged. The fourth element of a retaliation claim is evaluated using the three-stage burden shifting framework set forth in *McDonnell Douglas*. *Id.* at 406. "At the first stage, the employee has the burden of producing evidence 'that [s]he engaged in protected conduct, that [s]he suffered some adverse action, and that a causal connection existed between the protected conduct and the adverse action." *Id.* (quoting *Mole v. University of Mass.*, 442 Mass. 582, 981-92 (2004)) (alternations in original). If the plaintiff satisfies that burden, then the employer must "'articulate a legitimate, nondiscriminatory reason for' the adverse employment decision." *Id.* (quoting *Esler v. Sylvia-Reardon*, 473 Mass. 775, 780 n.7 (2016). The burden then shifts back to the plaintiff to "produce evidence that the employer's 'stated reason for [its adverse action] was a pretext for retaliating against her on account of her' protected activity." *Id.* (quoting *Esler*, 473 Mass. at 780 n.7) (alteration in original).

As discussed above, CAI has met its burden of articulating a legitimate reason for plaintiff's termination, and plaintiff has failed to meet her burden of establishing that its articulated reason is a pretext. Accordingly, summary judgment will also be granted as to the retaliation claim.

## IV.   Conclusion

For the reasons set forth above, the motion to strike of defendant Community Action Inc./Head Start is GRANTED in part and DENIED in part. The motion of defendant

Community Action Inc./Head Start for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated:  July 27, 2017                       United States District Judge